Filed 3/20/20

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ANDREW M., a Person Coming Under the Juvenile Court Law. | B294704 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.M., JR.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK21526B) |

APPEAL from orders of the Superior Court of Los Angeles County, Nancy A. Ramirez, Judge. Reversed with directions.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

E.M., Jr., (father) appeals from the order of the juvenile court taking jurisdiction over his son, Andrew M. He contends the court erred by failing to appoint counsel for him, despite his numerous requests. We agree and reverse the order with directions.

## BACKGROUND

I.     The dependency of Andrew's older brother, E.M.

In 2017, the juvenile court declared Andrew's older brother E.M. a dependent based on a petition alleging that father and mother engaged in domestic violence in E.M.'s presence, both parents abused marijuana, and mother abused methamphetamines. The court ordered E.M. placed with father under the supervision of the Department of Children and Family Services (DCFS) and ordered father into a program of family maintenance.

Andrew was born at the end of the same month. Father lived with both children in an apartment upstairs from mother and was complying with E.M.'s case plan. Two months after Andrew's birth, both parents were arrested. Father arranged for maternal aunt to live in his apartment and take care of E.M. and Andrew. He then filled out an "affidavit with consent" and asked DCFS to place his children with maternal aunt or paternal grandmother.

2

In August 2017, DCFS filed an original petition (Welf. & Inst. Code, § 300, subds. (a) & (b)(1))[1] on behalf of Andrew and filed a subsequent petition on behalf of E.M. (§ 342).

II.     There is no evidence the juvenile court appointed father an attorney for Andrew's detention hearing.

   A.     *The August 8, 2017 hearing*

Father was not notified of the August 8, 2017 detention hearing for both of his sons. His attorney in E.M.'s case appeared on father's behalf, but only on E.M.'s subsequent petition. The juvenile court granted that attorney's request to continue Andrew's detention hearing, to enable father to be brought to the hearing where the court would, among other things, consider the question of appointment of counsel for him. (See § 316; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedures (2019) § 2.40 (Seiser & Kumli).) The court detained both Andrew and E.M., scheduled father's arraignment hearing[2] on Andrew's

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The purpose of the initial or detention hearing is to determine whether to detain the child from parental custody, to notify parties of the allegations, to consider whether to appoint counsel and whether to involve the court in supervision of the case. (Seiser & Kumli, *supra*, § 2.40.) Some juvenile courts refer to the initial or detention hearing as the "[a]rraignment hearing[ ]." That is a misnomer because arraignment hearings are conducted in criminal, not dependency, cases. (*Ibid.*) However, we use the word arraignment here because it was used in this case.

3

petition, and set a later date for the children's jurisdiction hearing.

In October 2017, father was sentenced to 25 years in prison.

B.  *The October 25, 2017 hearing*

On October 25, 2017, the juvenile court offered to appoint father's attorney in E.M.'s case to represent father on Andrew's petition.  Counsel explained that father had not yet been arraigned on Andrew's petition, and so such an appointment would be premature.  The court set November 20, 2017 for father's detention hearing and ordered him removed from jail.

C.  *The November 20, 2017 hearing*

An unsigned, undated form JV-451, the prisoner's statement regarding appearance at hearing affecting parental rights, which had been sent to father before the November 20, 2017 hearing, has the boxes checked requesting appointment of an attorney and waiving the right to appear.  On November 13, 2017, father executed a JV-451 form waiving his right to appear at the November 20, 2017 hearing, but leaving unchecked the boxes indicating that (1) he understood he had a right to representation, and (2) already had representation, (3) wanted representation, or (4)  declined representation "at this hearing."

On November 20, 2017, there were no appearances and so the juvenile court trailed the case to the following day.  No appearances were made on November 21.  The court "set[ ] a further continuance," to an unspecified date "[d]ue to Court congestion," while noting that January 17, 2018 remained the date for the jurisdiction hearing.  The court then continued the

4

January 17, 2018 jurisdiction hearing so that father could be brought into court.

### D. *The February 8, 2018 hearing*

In advance of the scheduled arraignment hearing on February 8, 2018, father signed a JV-451 form requesting appointment of an attorney and indicating he wanted to appear. There is no record of what occurred on February 8, 2018, but no attorney was appointed for father.

III. The juvenile court did not appoint counsel for Andrew's jurisdiction hearing.

The juvenile court scheduled the jurisdiction hearing six times from April 2018 to November 20, 2018. The court continued each hearing and ordered that father be brought to court. In advance of four of the hearings, father executed JV-451 forms requesting that an attorney be appointed to represent him and declining to appear. Father declined representation before two of the hearings scheduled in June 2018.

The juvenile court finally held the jurisdiction hearing on November 20, 2018. Father again requested representation at that hearing but declined to appear. Without appointing counsel for father, the juvenile court found him to be Andrew's biological father and sustained the petition declaring Andrew to be described by section 300, subdivision (b). The court awarded father monitored visitation. Father filed two notices of appeal.[3]

---

[3] Father's appellate briefs raise issues as to Andrew only. Therefore, any issues identified in the notices of appeal concerning E.M. are deemed to have been abandoned. (Cf. *In re Sade C.* (1996) 13 Cal.4th 952, 994.)

# DISCUSSION

I.      The failure to appoint an attorney for father was error.

A juvenile court must appoint counsel for an indigent parent when the agency recommends that the child be placed in out-of-home care, "unless the court finds that the parent or guardian has made a knowing and intelligent *waiver of counsel* as provided in this section." (§ 317, subd. (b), italics added.)  The representation shall continue unless the juvenile court relieves counsel.  (*Id.*, subd. (d).)

Other statutes direct the juvenile court to address the appointment of counsel for parents.  The court must notify parents of the right to representation at the initial or detention hearing (§ 316; see Cal. Rules of Court, rule 5.534(d)(1)(B)) and shall appoint counsel at the beginning of the hearing on a petition, if a parent "desires to be represented by counsel" and cannot afford one.  (§ 353.)

Generally, however, counsel is only to be appointed for an indigent parent when that parent "appears and requests such appointment *or otherwise communicates to the court such a desire.*" (Seiser & Kumli, *supra*, § 2.61, italics added.)  A waiver of the right to counsel must be made knowingly and intelligently (§ 317, subd. (b)), whereas to obligate the juvenile court to appoint counsel, the indigent parent need only give "some manifestation . . . that he or she wants representation." (*In re Ebony W.* (1996) 47 Cal.App.4th 1643, 1647.)  Section 317 merely "requires the indigent parent to communicate *in some fashion* his or her desire for representation before the juvenile court is obligated to appoint counsel." (*Ebony W.*, at p. 1647, italics added.)

With respect to incarcerated parents in particular, Penal Code section 2625, subdivision (d) bars the adjudication of a section 300 petition *without the physical presence of both* the incarcerated parent and his or her counsel, unless the parent waives the right to attend. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 621–624.) Thus, an incarcerated parent may waive his or her appearance, but the juvenile court may only adjudicate the petition if that parent has representation at the hearing. (Pen. Code, § 2625, subd. (d).)

" 'There is nothing vague or ambiguous about the legislative command—in the absence of a waiver, the juvenile court must appoint an attorney to represent an indigent parent at the detention hearing and at all subsequent proceedings.' " (*In re J.P.* (2017) 15 Cal.App.5th 789, 796.)

DCFS contends, citing *In re Joseph G.* (2000) 83 Cal.App.4th 712, that father repeatedly waived his right to *attend* the hearings with the result he has no standing to appeal based on his disinterest in attending and participating in the proceedings. *In re Joseph G.* involved a biological father who was not in custody. (*Id.* at p. 714.) In contrast, father here, was incarcerated and did not waive his appearance at the last arraignment hearing scheduled for him on February 6, 2018. Father had the right to anticipate representation at the jurisdiction hearing after he requested counsel be appointed and opted not to appear himself. (Pen. Code, § 2625, subd. (d); Welf. & Inst. Code, § 317, subd. (b).)

DCFS next contends that the juvenile court was not required to appoint an attorney to represent father in Andrew's case because on two occasions he waived his right to counsel. To support this contention, DCFS argues this case is similar to *In re*

7

*Ebony W.*, *supra*, 47 Cal.App.4th 1643.  There, the mother was not in custody and never indicated a desire for representation. (*Id.* at p. 1648.)  The appellate court held under those circumstances that the juvenile court was not required to appoint counsel for the mother.  (*Ibid.*)

The facts of this case are nothing like those of *Ebony W.* Father was incarcerated and clearly unable to afford an attorney. He *requested representation six out of nine times*.  In particular, he requested appointment of counsel repeatedly for each of Andrew's scheduled detention hearings and for the November 20, 2018 hearing at which the juvenile court adjudicated Andrew's petition.  These repeated requests triggered the juvenile court's obligation to appoint counsel for father in Andrew's case.

Father's attorney in E.M.'s case reminded the court at the outset of the November 20, 2018 jurisdiction hearing that "[f]irst, just so that it's clear on the record, our firm has not been appointed for father as to the child Andrew.  [¶] . . . *Father has never been arraigned*."  (Italics added.)  Counsel also told the court that the petition was not attached to any notice given to father and there was no indication that any DCFS report had been mailed to him.  When the court asked DCFS whether it needed to appoint counsel, the agency responded that father was aware of the case and had chosen not to participate.  DCFS omitted to make any mention of the fact that father had actually requested appointment of counsel in nearly every one of his JV-451 forms.  The court knew that father had never been arraigned, but found that that notice was given and that father had waived *appearance*.  On that basis, the court proceeded with the adjudication.  Father's decision to waive his appearance did not

8

constitute a knowing and intelligent waiver of his right to representation.  This was clear error.

II.    Reversal

Father contends that the error, which violates a statute, is structural and mandates reversal.

Trial errors " 'occur[ ] during the presentation of the case to the jury' and [their] effect . . . can 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.' " (*In re James F.* (2008) 42 Cal.4th 901, 914, quoting from *Arizona v. Fulminante* (1991) 499 U.S. 279, 307–308.)  In contrast, " 'structural defect[s] affecting the framework within which the trial proceeds' . . . 'defy analysis by "harmless-error" standards' and can never be harmless."  (*James F.*, at p. 914.)

Father cites *In re Christina H.* (1986) 182 Cal.App.3d 47, 49, that "[c]learly, . . . in *many cases* an indigent parent possesses both a statutory and constitutional right to appointed counsel."  (Italics added.)  While an accurate statement, this quote does not advance the analysis here.  Generally, "[t]he harmless error [rather than structural error] analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension."  (*In re J.P., supra*, 15 Cal.App.5th at p. 798.)

Our Supreme Court in *In re James F., supra*, 42 Cal.4th at pages 915 to 916, questioned whether structural error, a criminal law doctrine, "should be imported wholesale, or unthinkingly, into the quite different context of dependency cases."  *James F.* cited United States Supreme Court authority to explain that generally, an error is structural when it " 'def[ies] analysis by "harmless-error" standards' " and cannot " 'be quantitively assessed in the context of *other evidence presented* in order to

9

determine whether [it was] harmless beyond a reasonable doubt.' " (*Id*. at p. 917, italics added.)  The structural error doctrine is used when " 'assessing the effect of the error' " is " 'difficult[ ].' " (*Ibid*.)

Following that lead, the appellate court in *In re J.P.*, *supra*, 15 Cal.App.5th 789, analyzed whether the juvenile court's error in failing to grant mother's request for re-appointment of counsel before the hearing on her petition for modification under section 388 deprived the mother of due process and prejudicially affected the manner in which the hearing was conducted.  The *J.P.* court applied the harmless error analysis "because [it] conclude[d] the juvenile court's error here is 'amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice.' " (*Id*. at p. 800.)

Here, it is reasonably probable that a more favorable result would have been reached had the juvenile court appointed an attorney for father.  (See *In re J.P.*, *supra*, 15 Cal.App.5th at pp. 798, 800, citing *People v. Watson* (1956) 46 Cal.2d 818.)  At the hearing, the court declared father Andrew's biological father.  The effect of this determination will reverberate throughout Andrew's dependency:  only mothers and presumed parents are entitled to reunification services.  (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 451.)  Juvenile courts may order services for a biological father, but only if they find that services will benefit the child.  (§ 361.5, subd. (a).)  But here, the record shows that father was caring for Andrew during the time he was arrested and created a plan for the baby, even making a placement request of DCFS.  These facts support a finding of presumed

fatherhood, a result much more favorable to father.[4]  We recognize that father will continue to be incarcerated until Andrew reaches the age of majority.  Nonetheless, that is not a justification for failing to appoint father an attorney to advocate for his participation in services and visitation with the child.

## DISPOSITION

All orders as to E.M., Jr., (father) and Andrew M. are reversed.  The trial court is directed to appoint counsel for father and commence de novo an arraignment hearing and a jurisdiction hearing without delay.

CERTIFIED FOR PUBLICATION.


DHANIDINA, J.


We concur:


EDMON, P. J.


LAVIN, J.

---

[4] Even were we unable to determine whether the error in failing to appoint counsel was harmless, we would conclude the reversal would be required for a different reason.  As father observes on appeal, there is no indication that he ever received a copy of Andrew's petition.  Such an error would be structural.  (*In re James F.*, *supra*, 42 Cal.4th at p. 914.)